## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT KIRK, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| THE DUN & BRADSTREET CORPORATION, CINDY CHRISTY, L. GORDON CROVITZ, JAMES N. FERNANDEZ, PAUL R. GARCIA, ANASTASSIA LAUTERBACH, THOMAS J. MANNING, RANDALL D. MOTT, and JUDITH A. REINSDORF, | ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) ) | |

Plaintiff Robert Kirk ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Dun & Bradstreet, Inc. ("Dun & Bradstreet" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Dun & Bradstreet, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed acquisition (the "Proposed Transaction") of Dun & Bradstreet by an investor group (the "Investor Group") led by

CC Capital, Cannae Holdings and funds affiliated with Thomas H. Lee Partners, L.P. ("THL").

2.      On August 8, 2018, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which Dun & Bradstreet's stockholders will receive $145 in cash for each share of Dun & Bradstreet common stock they hold (the "Merger Consideration").

3.      On September 12, 2018, in order to convince Dun & Bradstreet shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Proxy Statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the Proxy false and/or misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning the financial projections for the Company, which were developed by the Company's management and utilized by the Company's financial advisor, J.P. Morgan Securities LLC ("J.P. Morgan") in rendering its fairness opinion, both of which were relied upon by the Board in recommending shareholders vote in favor of the Proposed Transaction.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for contraventions of: (i) Rule 14a-9; and (ii) Regulation G, 17 C.F.R. § 244.100, in

violation of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Dun & Bradstreet shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.       This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.       Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.       Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Dun & Bradstreet is incorporated in this District.

## PARTIES

11.       Plaintiff is, and at all relevant times has been, a Dun & Bradstreet shareholder.

12.       Defendant Dun & Bradstreet is a Delaware corporation and maintains its principal executive offices at 103 JFK Parkway, Short Hills, New Jersey 07078. Dun & Bradstreet's common stock is traded on the NYSE under the ticker symbol "DNB."

13.     Individual Defendant Cindy Christy has served as a director of the Company since 2015.

14.     Individual Defendant L. Gordon Crovitz has served as a director of the Company since 2014.

15.     Individual Defendant James N. Fernandez has served as a director of the Company since 2004.

16.     Individual Defendant Paul R. Garcia has served as a director of the Company since 2012.

17.     Individual Defendant Anastassia Lauterbach has served as a director of the Company since 2013.

18.     Individual Defendant Thomas J. Manning has served as a director of the Company since 2013 and as Chairman of the Board and interim Chief Executive Officer since February 2018.

19.     Individual Defendant Randall D. Mott has served as a director of the Company since 2015.

20.     Individual Defendant Judith A. Reinsdorf has served as a director of the Company since 2013.

21.     The Individual Defendants and Dun & Bradstreet may collectively be referred to as "Defendants."  Each of the Individual Defendants herein is sued individually as well as in his or her capacity as an officer and/or trustee of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Dun & Bradstreet (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

23.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable.  As of June 30, 2018, there were approximately 37,125,490 shares of Dun & Bradstreet common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Dun & Bradstreet will be ascertained through discovery;

b.      There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants disclosed material information that includes non-GAAP financial measures without a presentation and reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

iii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g. A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

24. Dun & Bradstreet is a provider of business information and technology solutions, which help its customers reduce credit risk, manage business relationships, and collect cash and

receivables.   The Company's databases include information regarding both public and private companies around the world.

25.     On July 26, 2018, the Company announced the Proposed Transaction in a press release which states, in pertinent part:

> SHORT HILLS, N.J. – August 8, 2018 – Dun & Bradstreet (NYSE:DNB) (the "Company"), the global leader in commercial data, analytics and insights for businesses, today announced that it has entered into a definitive merger agreement to be acquired by an investor group (the "Investor Group") led by CC Capital, Cannae Holdings and funds affiliated with Thomas H. Lee Partners, L.P. ("THL"), along with a group of other distinguished investors.
>
> Under the terms of the agreement, which has been unanimously approved by Dun & Bradstreet's Board of Directors, Dun & Bradstreet shareholders will receive $145.00 in cash for each share of common stock they own, in a transaction valued at $6.9 billion including the assumption of $1.5 billion of Dun & Bradstreet's net debt and net pension obligations.
>
> The purchase price represents a premium of approximately 30% over Dun & Bradstreet's closing share price of $111.63 on February 12, 2018, the last day of trading prior to Dun & Bradstreet's announcement of a strategic review and an indication of its willingness to consider all options for value creation.
>
> Thomas J. Manning will lead the Company as Chief Executive Officer through the closing of the transaction. James N. Fernandez, a director of the Company since 2004 and Lead Director since February 2018, will serve as Chairman of the Board through the closing of the transaction.
>
> "Today's announcement is the culmination of a thoughtful and comprehensive review of the value creation opportunities available to the Company as part of a full portfolio and business assessment and exploration of strategic alternatives with multiple financial sponsors. As a result of this process, the Dun & Bradstreet Board of Directors unanimously determined that this all-cash transaction with the Investor Group is in the best interest of our shareholders and our Company," said Mr. Manning.
>
> Chinh Chu, Senior Managing Director and Founder of CC Capital, stated, "Dun & Bradstreet is a high-quality business with a 177-year history of serving its global customer base. We look forward to working with our partners and Dun & Bradstreet's talented team to unlock the immense potential within this venerable company."
>
> William P. Foley II, Chairman of Cannae Holdings, said, "In an increasingly data-driven world, Dun & Bradstreet's insight-driven business model and

interconnectivity across industries has positioned the Company for continued success. We are excited to grow the Company, increase operating efficiencies and improve the Dun & Bradstreet customer experience by providing enhanced business solutions."

Thomas Hagerty, a Managing Director at THL added, "We are honored to partner with an established leader in the commercial data and insight industry with a long history of excellence in helping customers and partners around the globe. As a private company, Dun & Bradstreet will be well positioned to reinvigorate growth and create increased value for all stakeholders."

The transaction will be financed through a combination of committed equity financing provided by the Investor Group, as well as debt financing that has been committed to by BofA Merrill Lynch, Citigroup, and RBC Capital Markets.

The merger agreement provides for a "go-shop" period, during which Dun & Bradstreet – with the assistance of J.P. Morgan – will actively solicit, evaluate and potentially enter into negotiations with and provide due diligence access to parties that offer alternative proposals. The go-shop period is 45 days. Dun & Bradstreet will have the right to terminate the merger agreement to enter into a superior proposal subject to the conditions and procedures specified in the merger agreement, which Dun & Bradstreet will be filing presently on Form 8-K. There can be no assurance this process will result in a superior proposal. Dun & Bradstreet does not intend to disclose developments about this process unless and until its Board of Directors has made a decision with respect to any potential superior proposal.

The transaction is expected to close within six months, subject to Dun & Bradstreet shareholder approval, regulatory clearances and other customary closing conditions. The Dun & Bradstreet Board is unanimously recommending that shareholders vote to adopt the merger agreement at an upcoming special meeting of the shareholders.

Upon the completion of the transaction, Dun & Bradstreet will become a privately held company and shares of Dun & Bradstreet common stock will no longer be listed on any public market.

26.     The Merger Consideration appears inadequate in light of the Company's recent financial performance.  Indeed, the Company has recently reported very positive financial results, including double-digit net income and earnings per share growth for fiscal year 2017.  Moreover, the Company's momentum appears to be continuing with the Company reporting triple-digit and double-digit net income growth for the first two quarters of 2018, respectively.

27.     In sum, it appears that Dun & Bradstreet is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

**The Materially Incomplete and Misleading Proxy**

28.     On September 12, 2018, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits both required and material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materiality of Financial Projections*

29.     A company's financial projections are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the financial forecasts were relied on to approve the Merger Agreement and recommend the Proposed Transaction to shareholders as the Proxy discloses that the financial projections were prepared by the Company's management "for the use of the Board and J.P. Morgan[.]" Proxy at 65.

30.    When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regards to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

31.    Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  *Id.*

32.    In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

(i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the*

*reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

33.     Here, Dun & Bradstreet's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board determined that:

> D&B's future prospects if it were to remain a stand-alone public company, including the significant business, financial and execution risks related to achieving the revenue growth and improved operating margins contemplated by D&B's financial projections as a stand-alone public company . . .

> the possible alternatives to a sale of the entire company, including continuing as a stand-alone public company (including to pursue potential growth initiatives contained within the Forecasts as described in the section entitled "Certain Unaudited Prospective Financial Information" beginning on [·]), spinning off or selling certain of D&B's business lines and engaging in a strategic transaction such as a PIPE transaction, which alternatives the Board evaluated with the assistance of its financial advisor and outside legal counsel and determined did not represent more attractive alternatives to a sale . . .

Proxy at 49-50.

34.     As discussed further below, the financial projections here do not provide Dun & Bradstreet's shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections.

### The Financial Projections are Materially Incomplete

35.     The Proxy discloses four sets of financial projections, the Risk-Adjusted High Probability Plan, the Target Base Plan, the Management 5-Year Plan, and the Aspirational Plan, for the Company on pages 63-64.  However, the Proxy fails to provide material information

concerning the projections, which were developed by the Company's management and relied upon in recommending that shareholders vote in favor of the Proposed Transaction.

36.     Specifically, the Proxy provides values for non-GAAP measure Core EBITDA (Post-SBC), "defined as earnings before interest, taxes, depreciation and amortization, less stock-based compensation ("SBC") expenses," Proxy at 63, but fails to provide the line items used in their respective calculation or a reconciliation of these non-GAAP measures to their respective most comparable GAAP measures.

37.     The Proxy also discloses that J.P. Morgan calculated the Company's unlevered free cash flows ("UFCF"), a non-GAAP financial measure defined as "unlevered net operating profit after tax, adjusted for depreciation and amortization, net pensions and adjustments, tax affected total reengineering payments, capital expenditures and changes in net working capital." Proxy at 60. None of the above referenced line items, nor a reconciliation to UFCF's most comparable non-GAAP measure were disclosed.

38.     The Proxy further discloses that J.P. Morgan's UFCF calculations were "based upon the projected financial data in the Risk-Adjusted High Probability Plan as provided to J.P. Morgan by management of D&B and approved by D&B for J.P. Morgan to use for the purpose of calculating unlevered free cash flows." Proxy at 60.

39.     Despite acknowledging that "Non-GAAP financial measures should not be considered in isolation from, or as a substitute for or superior to, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by D&B may not be comparable to similarly titled amounts used by other companies," Proxy at 65, the Proxy provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.

40.     The misleading nature of the disclosed financial information is further exacerbated by the Proxy's disclosure that:

> The Board reviewed the assumptions underlying each of the Forecasts with management and, after taking into account these consultations with management, adopted, on July 23, 2018, the view of management that the Risk-Adjusted High Probability Plan reflected the best currently available estimates and judgments of the future financial performance of D&B. Accordingly, the Board instructed J.P. Morgan to use the Risk-Adjusted High Probability Plan for purposes of its financial analysis of the merger.

Proxy at 63.

41.     Although the Proxy goes on to discuss the reasons for utilizing the Risk-Adjusted High Probability Plan, shareholders are unable to understand how these qualitative reasons, in fact, changed the Company's future outlook due to the failure to disclose the line items above or provide a reconciliation.

42.     As a result of the Company's incomplete disclosures surrounding the calculation of the above referenced financial metrics, the Proxy is materially misleading as shareholders are provided an incomplete and materially misleading understanding of the Company's future prospects.

43.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### *The Financial Projections Violate Regulation G*

44.     The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

45.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure. 17 C.F.R. § 244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     United States Securities and Exchange Commission, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (2002), *available at* https://www.sec.gov/rules/final/33-8176.htm (last visited September 19, 2018) ("SEC, *Final Rule*").

[4]     SEC, *Final Rule*.

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/ (last visited September 19, 2018); Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited September 19, 2018).

Dun & Bradstreet included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.   Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.

(emphasis added) (footnotes omitted).[6]

46.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).   Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

47.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation, or at the very least, the line items utilized in calculating the non-GAAP measures renders the financial projections disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP measures and their respective most comparable GAAP financial measures.

---

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted) (last visited September 19, 2018).

48.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading.  Indeed, Defendants acknowledge the misleading nature of non-GAAP projections, as Dun & Bradstreet shareholders are cautioned: "Non-GAAP financial measures should not be considered in isolation from, or as a substitute for or superior to, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by D&B may not be comparable to similarly titled amounts used by other companies."  Proxy at 65.

49.     The misleading nature of the non-GAAP figures here is further exacerbated by the Proxy's disclosure of four set of financial projections, only one of which, the Risk-Adjusted High Probability Plan, was considered in recommending that shareholders vote in favor of the Proposed Merger.  Proxy at 64.

50.     More specifically, the Proxy discloses that:

The Target Base Plan, the Management 5-Year Plan and the Aspirational Plan were the result of several months of work by management, together with support from a management consulting firm, that focused on mapping out potential initiatives to grow revenues and increase margins through new approaches to sales, product enhancements, technology improvements and cost savings.

Proxy at 62.

51.     Notwithstanding the "several months of work by management" in developing these projections, the Board relied upon, and directed J.P. Morgan to utilize, the Risk-Adjusted High Probability Plan, which was prepared "in mid July 2018."  Proxy at 62-63.

52.     Considering the significant downward revisions of the Company's future financial earnings in the Risk-Adjusted High Probability Plan, shareholders would clearly find it material to have a complete and non-misleading understanding of the "adjustments to the Target Base Plan[.]" Proxy at 63.

53.     Thus, without disclosing the line items utilized in calculating the non-GAAP financial measures, shareholders are being provided a materially misleading picture of the various projection sets developed by the Company's management.

54.     As such, in order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 62-65, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

55.     In sum, the Proxy independently violates: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial measure to its most directly comparable GAAP equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Dun & Bradstreet shareholders.

56.     Absent disclosure of the foregoing material information prior to the special shareholder meeting, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and 17 C.F.R. § 244.100 Promulgated Thereunder)**

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any [Proxy] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

59.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

60.     The failure to reconcile the numerous non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder)**

61.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

62.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in Proxy communications that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

63. Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

64. Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

65. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

66. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

67.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

68.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a Proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

69.     Dun & Bradstreet is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

70.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

71.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

72.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

73.     The Individual Defendants acted as controlling persons of Dun & Bradstreet within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Dun & Bradstreet, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

74.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the Proxy.

76.     In addition, as described herein and set forth at length in the Proxy, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

77.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

78.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

79.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  September 19, 2018

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: */s/ Michael Van Gorder*
Michael Van Gorder (#6214)
20 Montchanin Road, Suite 145
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: mvangorder@faruqilaw.com

**OF COUNSEL:**

*Counsel for Plaintiff*

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*